UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JASMINE GLORIA SHANAY NEAL, | CASE NO. 5:24-CV-00237-DAC |
| Plaintiff, | |
| | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | |
| | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Jasmine Neal challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 8, 2024, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Feb. 8, 2024). Subsequently, all parties consented to my exercising jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #7), and on March 7, 2024, this matter was re-assigned to me for disposition. (Non-document entry dated March 7, 2024). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

This case concerns Ms. Neal's second application for benefits. Ms. Neal was first found disabled beginning on December 13, 2012. (*See* Tr. 80). On March 12, 2019, the Commissioner

1

found Ms. Neal no longer disabled as of March 1, 2019. (*See id.*). Ms. Neal requested a hearing before an Administrative Law Judge and so on September 1, 2020, Ms. Neal (without counsel) appeared for a hearing.[1] (*See id.*). On November 18, 2020, the ALJ determined Ms. Neal was no longer disabled as of March 1, 2019, and had not become disabled again since then. (Tr. 77-90).

Ms. Neal subsequently applied for DIB and SSI on May 6, 2021, alleging a disability-onset date of November 19, 2020. (Tr. 100, 114). The claims were denied initially and on reconsideration. (Tr. 161, 166, 174, 177). Ms. Neal then requested a hearing before an ALJ. (Tr. 181). Ms. Neal (represented by counsel) and a vocational expert (VE) testified before the ALJ on March 7, 2023. (Tr. 54-76). On March 15, 2023, the ALJ determined Ms. Neal was not disabled. (Tr. 34-48). On December 18, 2023, the Appeals Council denied Ms. Neal's request for review, making the second hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2)). Ms. Neal (represented by new counsel) then timely filed this action on February 8, 2024. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

Ms. Neal was 27 years old as of the 2020 disability-onset date and 31 years old at the 2023 hearing. (*See* ECF #1-1 at PageID 693). She has a high school education and prior work experience as a home attendant. (Tr. 60, 71).

---

[1]      The transcript of the September 2020 hearing was not included in the administrative record before this Court.

## II.       Relevant Medical Evidence

Ms. Neal claims disability for her multiple sclerosis, Graves' Disease,[2] and major depressive disorder. (Tr. 101, 104, 115, 118). She has been diagnosed with relapsing-remitting multiple sclerosis (MS) since 2012. (Tr. 350). Ms. Neal also suffers from Graves' Disease; although diagnosed in 2018, this condition has been present for an undetermined amount of time before that. (*See* Tr. 488, 503).

On January 1, 2021, Ms. Neal attended a telemedicine appointment with her treating neurologist, Christopher Sheppard, M.D., who has been treating her MS since at least June 2017. (Tr. 434; *see also* Tr. 350). Ms. Neal reported falling repeatedly, up to once per day but denied tripping, feeling dizzy, or noticing weakness in her legs. (Tr. 434-35). She did not report any injuries from her falls, and she could stand up after a few seconds. (Tr. 435). She reported continued fatigue and left-arm weakness and numbness. (*Id*.). Dr. Sheppard believed Ms. Neal should be prescribed medication but he noted prior medications were ineffective or resulted in significant side effects. (Tr. 436). Dr. Sheppard also instructed Ms. Neal to pay attention to her falls to see if she could discern an episodic weakness or foot drop that could be causing them. (*Id*.).

When Ms. Neal returned to Dr. Sheppard on March 10, 2021, she reported not falling since her January appointment . (Tr. 438-39). However, she had recently started experiencing sensory changes in her (non-dominant) right hand, first feeling itching, then pins and needles, but no weakness. (Tr. 439). Her right arm, left arm, left hand, and legs were unaffected. (*Id*.). Ms. Neal also reported forgetting things she was supposed to participate in over the weekend. (*Id*.). Dr.

---

[2]        Graves' Disease is an autoimmune disorder that affects the thyroid gland. *Graves Disease*, *MedlinePlus*, http://medlineplus.gov/ency/article/000358.htm (last accessed Sept. 24, 2024).

Sheppard again recommended medications and scheduled a follow-up appointment in a few months. (*Id.*).

On August 30, 2021, Ms. Neal followed up with Dr. Sheppard. (Tr. 443). She reported more sensory issues in her non-dominant right hand where her whole hand and fingers would go numb and burn constantly. (Tr. 444). Her legs also felt weak when waking, and she struggled with coordination when playing sports. (*Id.*). An examination revealed mild difficulty with coordination while moving her finger to her nose and a slightly ataxic gait. (Tr. 445). She also reported chronic problems with her memory and noticed repeating herself. (Tr. 444). Dr. Sheppard prescribed a trial of Ocrevus[3] and scheduled a follow-up appointment two months later. (Tr. 445).

On March 11, 2022, Ms. Neal returned to Dr. Sheppard. (Tr. 606). His progress note recounts she received her first two doses of Ocrevus in October and November 2021 and tolerated them well with no side effects or reactions. (Tr. 606-07). Dr. Sheppard assessed no subsequent relapses of her MS. (Tr. 608). Ms. Neal reported continued intermittent episodic weakness and numbness in her legs, causing her balance difficulties. (Tr. 607). Although she also experienced intermittent tremors, she reported they did not interfere with her activities. (*Id.*). She also reported feeling depressed, that she was in counseling, and it was helping. (*Id.*).

On September 21, 2022, Ms. Neal followed up with Dr. Sheppard. (Tr. 620). Her blood tests since starting Ocrevus revealed a concerning drop in her white-blood-cell counts, a similar result to her previous failed medication regimens. (Tr. 620-21). Dr. Sheppard took her off Ocrevus. (Tr. 621). He assessed her as stable neurologically with no increased disease activity or

---

[3]     Ocrevus is a brand name for ocrelizumab, a monoclonal antibody used to control the symptoms of multiple sclerosis. *Ocrelizumab Injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a617026.html (last accessed Sept. 24, 2024).

relapses. (Tr. 622). Ms. Neal also reported she fell after her right foot gave out while walking downstairs, injuring her lower back. (Tr. 621). Dr. Sheppard ordered x-rays of her spine and prescribed pain medication. (Tr. 623).

On February 6, 2023, Ms. Neal returned to Dr. Sheppard for an in-person examination and to discuss a new MS medication. (Tr. 630). They decided to wait for her to return to baseline before trialing any new medication. (*See* Tr. 632-33). Ms. Neal reported since the last visit, her leg gave out and she fell again, injuring her elbow. (Tr. 631). She also reported mood problems, including becoming angry and frustrated easily, controlling her emotions, and crying and laughing inappropriately. (*Id.*). Dr. Sheppard identified these symptoms as consistent with a pseudobulbar affect[4] and prescribed medication. (Tr. 632).

On November 12, 2020, Ms. Neal consulted with her treating endocrinologist, Suzanne Harold, M.D., regarding her Graves' Disease. (Tr. 503, 505). Her condition is rated as moderate in severity. (*Id.*). Ms. Neal had been prescribed methimazole[5], though had not been fully compliant with her medication regimen. (Tr. 503, 505). Subsequent visits between December 2020 and November 2021 detailed similar findings. (Tr. 488-94, 496-98, 500-02, 573-76, 569-71).

---

[4]    Pseudobulbar affect is a condition characterized by episodes of sudden uncontrollable and inappropriate laughing or crying and typically occurs in people with certain neurological conditions such as M.S. *Pseudobulbar Affect*, Mayo Clinic, *Pseudobulbar Affect*, *Mayo Clinic*, http://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/syc-20353737?p=1 (last accessed Sept. 24, 2024).

[5]    Methimazole is a medication used to treat hyperthyroidism. *Methimazole*, *Medline Plus*, http://medlineplus.gov/druginfo/meds/a682464.html (last accessed Sept. 24, 2024).

### III.    Medical Opinions

On October 9, 2021, Ms. Neal attended a physical examination with Zachary Richens, D.O., in connection with her disability applications. (Tr. 552-56). Dr. Richens confirmed Ms. Neal's diagnoses. (Tr. 556). Dr. Richens observed Ms. Neal could not complete tandem-walking or bilateral one-foot-stand tests. (*Id.*). Dr. Richens observed a 3/5 strength on the right hip and 5/5 strength elsewhere. (Tr. 557-58). Dr. Richens opined Ms. Neal had significant MS-related weakness that prevented her from having full use of her extremities and from bending, stooping, crouching, and squatting all the time. (Tr. 556).

On November 11, 2021, state agency medical consultant Dimitri Teague, M.D., reviewed Ms. Neal's record as part of the initial determination of her disability applications. (Tr. 107-10, 121-24). Dr. Teague divided the opinion into two periods. For the first period (November 19, 2020 disability-onset date to the May 6, 2021 application date), he assessed that Ms. Neal's Graves' Disease would not change the previous ALJ's determination that Ms. Neal was not disabled because her Graves' Disease was moderate in severity and she was not fully compliant with her prescribed medications. (Tr. 107-08, 121-22).

For the second period (after May 6, 2021), Dr. Teague assessed a new RFC for Ms. Neal, assessing she could lift or carry 20 pounds occasionally and 10 pounds frequently. (Tr. 108, 122). Regarding postural limitations, Dr. Teague assessed Ms. Neal could never climb ladders, ropes, or scaffolds and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (*Id.*). Regarding manipulative limitations, Dr. Teague assessed Ms. Neal was limited to frequent handling and fingering with both upper extremities. (Tr. 109, 123). Regarding environmental limitations, Dr. Teague assessed Ms. Neal should avoid hazards, such as dangerous machinery, unprotected heights, and commercial driving. (*Id.*).

On June 21, 2022, state agency medical consultant Mehr Siddiqui, M.D., adopted Dr. Teague's opinions for both periods on reconsideration review. (Tr. 135-37, 149-51).

## IV.    Relevant Testimonial Evidence

Ms. Neal testified that she lived with her mother, who handled the cooking, cleaning, and laundry. (Tr. 60, 67). Ms. Neal can only be on her feet for three to four minutes, so she uses a walker whenever she must stand, including trips as short as visiting the bathroom. (*See* Tr. 62-63). Ms. Neal described her typical day consists of lying on the couch with her legs elevated and watching YouTube. (Tr. 66-67). She does not go out and talks only with her mother and aunt. (Tr. 67).

Ms. Neal recounted that both her hands shake painfully and go numb at least twice per day. (Tr. 61-62, 70). The tremors also extend into her arms. (Tr. 70). Her hands stay numb for various amounts of time, ranging from a few seconds to the entire day. (*See* Tr. 62). The numbness makes it hard for her to pick up items. (Tr. 69). She rests after taking medications to allow similar tremors and numbness in her legs to pass. (*See* Tr. 61). Ms. Neal also recounted being fatigued. (Tr. 69). She cannot sleep through the night and struggles to fall asleep. (Tr. 64). She had to stop her medication for her Graves' Disease because it affected her ability to breathe properly. (*See* Tr. 68-69).

The ALJ posed to the VE a hypothetical individual with Ms. Neal's age and education who: (i) can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; (ii) can sit for six hours of a normal eight-hour work day and walk for four hours in 30-minute increments; (iii) can occasionally ramps or stairs; (iv) can never climb ladders, ropes, or scaffolds; (v) can occasionally balance, stoop, kneel, crouch, and crawl; (vi) can frequently handle and finger bilaterally, (vii) must avoid all exposure to extreme heat, workplace hazards, such as unprotected

heights and dangerous moving machinery, and commercial driving; (viii) can perform simple, routine tasks, but not assembly-line work, not at a fast-paced production rate, and not with strict production quotas; and (ix) is limited to superficial interactions with others, meaning no customer service duties, confrontation, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for others' safety. (Tr. 72-73). The VE testified such an individual could not perform Ms. Neal's prior work as a home attendant but could perform other unskilled jobs instead, such as mail clerk, marker, or routing clerk. (Tr. 73).

The ALJ then posed a hypothetical individual with the previously described limitations but can sit for three hours in an eight-hour workday and walk in five-minute increments and for one hour total. (Tr. 74). The VE testified such an individual would not be able to sustain competitive employment. (*Id.*).

The ALJ then returned to the first hypothetical individual but added the individual would be off task for 33% of the day on an ongoing basis. (*Id.*). The VE concluded there would be no jobs available for such an individual and opined that a person who is off task more than 10% of the day is unemployable. (*Id.*).

The ALJ again returned to the first hypothetical individual but further restricted the individual to occasional (as opposed to frequent) handling and fingering. (*Id.*). The VE testified no jobs are available for such an individual. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Neal had not engaged in substantial gainful activity since November 19, 2020. (Tr. 37).[6] At Step Two, the ALJ identified Ms. Neal's MS, Graves' Disease, and major depression as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Neal's impairments did not meet the requirements of, or were medically equivalent to, a listed impairment. (Tr. 37-39).

At Step Four, the ALJ determined Ms. Neal's RFC as follows:

> After careful consideration of the entire record, I find that [Ms. Neal] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that [Ms. Neal] may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday, in increments of no more than thirty minutes each; [she] may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; [she] may frequently handle and finger bilaterally; [she] must avoid concentrated exposure to extreme heat and must avoid all exposure to unprotected heights, dangerous moving machinery, and commercial driving; [she] is limited to the performance of simple, routine tasks, conducted in a work setting free of fast-paced production requirements or strict production quotas (as is found in assembly line work), performed within a set routine where major changes are explained in advance and gradually implemented, which setting requires no more than occasional and superficial (defined as precluding customer service duties, as well as tasks involving confrontation, conflict resolution, the direction of, persuasion of, influence of, or conferral of responsibility upon the claimant for the safety or welfare of, others) interaction with others. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments, as documented in the current evidence.

(Tr. 39-40). The ALJ then found Ms. Neal cannot perform her past relevant work as a home health aide. (Tr. 46). At Step Five, the ALJ determined jobs exist in significant numbers in the national

---

[6]     Although Ms. Neal worked in 2021, her earnings were below the threshold to be regarded as "substantial gainful activity." (Tr. 37).

10

economy that Ms. Neal can perform, including mail clerk, marker, and routing clerk. (Tr. 47-48). Therefore, the ALJ found Ms. Neal was not disabled. (Tr. 48).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is

a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

### DISCUSSION

Ms. Neal argues the ALJ erred at Step Four of the sequential analysis in two ways:

1.  The ALJ failed to support the RFC with substantial evidence when he applied the wrong standard of review by adopting the findings of the prior ALJ; and

2.  The ALJ's RFC was contrary to law and the evidence in this matter which established that the combination of Ms. Neal's symptoms precluded her from engaging in substantial gainful activity on a full time and repeated basis.

(*See* ECF #9 at PageID 671). The Commissioner responds that the ALJ conducted a fresh review of Ms. Neal's application, and his findings are supported by substantial evidence. (ECF #10 at PageID 702, 704-05). I discuss each in turn.

**I.      The ALJ applied the proper legal standard by providing a "fresh look" at Ms. Neal's application and crafted an RFC independent of the first determination.**

Ms. Neal first argues the ALJ applied the wrong standard of review by adopting the previous RFC from the November 2020 decision that she was not disabled after March 1, 2019. (ECF #9 at PageID 677). The Commissioner responds that the ALJ performed a fresh review of the record and, though the differences between the two RFCs are minor, the ALJ followed the principles for evaluating a subsequent disability application articulated in the Sixth Circuit's decision in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). (ECF #11 at PageID 702-04).

In her reply brief, Ms. Neal argues that the Commissioner's advanced argument is "a post hoc rationalization regarding the ALJ's incorrect adoption of the prior ALJ determination." (ECF #12 at PageID 710). The court may not accept counsel's post-hoc rationalization for an agency's action. *See Revello v. Comm'r of Soc. Sec.*, No. 5:20-CV-01860, 2021 WL 6064784, at *6 (N.D. Ohio Dec. 22, 2021) (quotation omitted). But Ms. Neal does not explain how the Commissioner's arguments were not the basis the ALJ articulated. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Thus, I consider this argument waived.

**A.      Sixth Circuit caselaw regarding the evaluation of subsequent disability applications**

In *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to

13

benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. In that case, the ALJ denied the claimant's initial claim for SSI because the claimant retained an RFC for sedentary work. *Id.* at 838. When the claimant re-filed her disability claim, a second ALJ found the claimant retained an RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "[r]es judicata applies in an administrative law context following a trial type hearing," the Sixth Circuit held the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id.* at 841-42. The Sixth Circuit concluded: "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

The Sixth Circuit clarified the scope of *Drummond* in *Earley*. There, the Sixth Circuit held that res judicata applies to subsequent applications for "the same period of time . . . rejected by the first application." *Earley*, 893 F.3d at 933. But the Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." [*New Hampshire v. Maine*, 532 U.S. 742,] 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.

> All of this helps to explain why *Drummond* referred to "principles of res judicata"—with an accent on the word "principles." 126 F.3d at 841-843. What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842; *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

14

*Id.*

Subsequent to *Earley*, district courts in the Sixth Circuit have disagreed as to whether an ALJ faced with a prior ALJ's RFC determination must either (1) simply review the evidence for the new relevant time period to see if the prior RFC must change to accommodate the new evidence or (2) review the application with no presumption that the prior RFC was correct. *See Najdl v. Comm'r of Soc. Sec.*, No. 1:21-CV-01578-SL, 2022 WL 2820413, at *9 (N.D. Ohio July 8, 2022) (collecting cases), *report and recommendation adopted*, No. 1:21-CV-1578, 2022 WL 2818444 (N.D. Ohio July 18, 2022).

In two unpublished decisions from this year, the Sixth Circuit has applied *Earley*, and those cases suggest neither pole is correct. *See Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662 (6th Cir. Mar. 20, 2024); *Gooden v. Comm'r of Soc. Sec.*, No. 23-3927, 2024 WL 2830817 (6th Cir. June 4, 2024). In *Dennis D.*, the Sixth Circuit rejected both the view that the ALJ must start the analysis with the prior decision and the view that the ALJ may never consider the prior decision:

> Dennis D. points us to the unpublished district court decision in *Nadia A.T. v. Comm'r of Soc. Sec.*, No. 3:22-cv-12, 2023 WL 2401723 (S.D. Ohio March 8, 2023). In *Nadia A.T.*, the district court vacated an ALJ's RFC determination because it found that the ALJ did not take a "fresh look" as required by *Earley*. *Id.* at *4. Specifically, the court concluded that although the ALJ acknowledged the new medical evidence as material, he did not treat the ruling on the prior application as nonbinding; instead, the ALJ for the subsequent, unadjudicated period, treated the prior RFC finding "as a mandatory starting place for his own RFC determination." *Id.*; *see also Robert K. v. Comm'r of Soc. Sec.*, No. 3:22-cv-91, 2023 WL 5662785, at *6 (S.D. Ohio Sept. 1, 2023) ("Thus, this Court holds that although ALJs may (and should) consider a prior ALJ decision, they may not use that prior decision as a starting point for their analysis or otherwise presume that it will dictate the outcome of the pending application."). In doing so, according to the court, the ALJ improperly took the view that he was compelled to measure the new medical evidence "against the backdrop" of the prior RFC finding instead of assessing the new evidence on its own merits.

15

> Given the above, the suggestion that an ALJ considering a subsequent application should not evaluate a claimant's new records for evidence of a significant change in relation to a prior valid finding strikes us as an overly broad reading of *Earley*. Presuming accuracy is not the same as treating prior findings as binding. [The second ALJ]'s analysis demonstrates that he did not consider himself bound by [the first ALJ]'s RFC finding. Rather, he considered it along with Dennis D.'s proffered evidence pertinent to the unadjudicated period to fashion Dennis D.'s RFC.

*Dennis D.*, 2024 WL 1193662, at *6. The *Dennis D.* Court further held, "it is the responsibility of the ALJ reviewing the claim for the later unadjudicated period to determine how much weight to accord both the prior decision and any newly submitted evidence; this includes the effect of a new regulatory threshold, if applicable. *Id.* at *4.

A few months later, the Sixth Circuit again considered whether the second ALJ failed to give a claimant's second application an independent "fresh look" in *Gooden* when the ALJ stated she "must adopt" the first ALJ's RFC unless "there is new and material evidence or changed circumstances" or "there has been a change in the relevant law." *Gooden*, 2024 WL 2830817, at *3. The Sixth Circuit again rejected the notion that the second ALJ errs by using the first ALJ's determinations as a starting point when the second application covers a new time period while also allowing the second ALJ to consider the prior decision if nothing has changed:

> [I]f the new application covers a new time period, the second ALJ *may* abide by the first ALJ's determinations as long as the claimant has failed to present "evidence of a change in condition" or satisfy a "new regulatory threshold." [*Earley*, 893 F.3d at 932]. This makes sense because, in such a case, "[n]othing ha[s] changed between the end of the first application and the beginning of the second one." *Id.*

*Id.* at *4. The *Gooden* Court cited *Dennis D.* as highly persuasive and fully consistent with *Earley* and found that, like in *Dennis D.*, the second ALJ in *Gooden* adequately conducted a "fresh look" by disclaiming reliance on the previous decision, "start[ing] anew at each of the step in the evaluation," "balance[ing] new testimonial evidence" against other medical evidence, "focus[ing] on

16

medical evidence from the period after the first decision," and "factoring in new datapoints" to assess new restrictions. *See Gooden*, 2024 WL 3593353, at *5; *see also Dennis D.*, 2024 WL 1193662, at *4-5.

### B.      The ALJ's determination of Ms. Neal's second application

Here, Ms. Neal's current application covers a different time period from her previous application—now alleging a disability-onset date of November 18, 2020, the day after the first determination. In deciding Ms. Neal's current application, the ALJ expressly found Ms. Neal had presented "new and material evidence" to the determination of disability and her past relevant work such that "it would not be appropriate to be bound, in their entirety, by the findings of" the first ALJ. (Tr. 34, 35). Because the ALJ determined there was a change in conditions since the first determination, I look to see if the ALJ treated review of Ms. Neal's application "as if he was bound by the prior decision." *See Gooden*, 2024 WL 2830817, at *4 (quoting *Dennis D.*, 2024 WL 1193662, at *4).

As stated above, the Sixth Circuit has cited several indicators that an ALJ took a "fresh look" of the matter: (1) an ALJ disclaiming reliance on the previous decision, (2) "start[ing] anew at each of the step in the evaluation," (3) "balance[ing] new testimonial evidence" against other medical evidence, (4) "focus[ing] on medical evidence from the period after the first decision," and (5) "factoring in new datapoints" to assess new restrictions. *See Gooden*, 2024 WL 3593353 at *5; *see also Dennis D.*, 2024 WL 1193662 at *4-5. Multiple of these indicators are present here.

First, the ALJ disclaimed reliance on the previous decision both at the administrative hearing and in his written decision. At the outset of the hearing, the ALJ stated "I have read the prior decisions that have been issued in your case. Those prior decisions are now history. I will make a new decision. My decision will be independent." (Tr. 58). Then, at the start of the written

decision, the ALJ twice stated that new evidence meant it would be inappropriate to be bound to the previous ALJ's determination. (Tr. 34, 35). In the RFC, the ALJ states "this finding departs from that of the previous decision[] in order to accommodate the present state of the impairments[] as documented in the current evidence." (Tr. 40). These disclaimers indicate the ALJ sought to make an independent decision based on the current evidence.

Second, the ALJ balanced Ms. Neal's new testimony against new medical evidence when he added a limitation to avoid extreme heat. (Tr. 40). Ms. Neal testified in the second hearing that she cannot sleep through the night because of sweating and overheating and that hot weather aggravates her MS. (Tr. 64). However, the records from the physical examination with Dr. Richens in October 2021 recount that Ms. Neal reported that cold weather aggravates her MS while warm weather alleviates her symptoms. (Tr. 552). The ALJ found Ms. Neal's testimony in the hearing more persuasive than her previous statement to Dr. Richens. (Tr. 40). That the ALJ expressly weighed two pieces of evidence, each from after the first decision, against each other and added a limitation not found in the first RFC both confirm the ALJ actually reviewed the second application.

Third, the ALJ discussed Ms. Neal's conditions with citations to medical evidence from after November 19, 2020 disability-onset date. Regarding Ms. Neal's Graves' Disease, the ALJ noted she had been diagnosed before the disability-onset date, but the ALJ discussed her current condition recorded in medical reports starting in June 2021. (Tr. 41) (citing Tr. 488, 490, 503, 504-05, 528, 554, 571, 574, 581, 637). The ALJ similarly discussed Ms. Neal's MS, noting she had been diagnosed in 2012, but discussed her current condition with spine and brain MRIs taken on October 15, 2021, and the ALJ found Ms. Neal's complaints of numbness to be consistent with

18

the MRIs. (*Id.*) (citing Tr. 565). The ALJ also discussed Ms. Neal's unsuccessful trial with Ocrevus

after the disability-onset date. (*Id.*) (citing Tr. 443). Regarding Ms. Neal's depression, the ALJ noted

Ms. Neal was diagnosed by the state agency consultant during her previous application. (Tr. 42)

(citing Tr. 549). But the ALJ noted Ms. Neal's mental-status examination after the second

application. (Tr. 42-43) (citing Tr. 547-48). The ALJ also noted her positive engagement with a

counselor in 2023 and that she had not taken medications since March 2021. (*Id.*) (citing Tr. 286,

310, 438, 631). This focus on the evidence of disability from after the first decision also indicates

the ALJ conducted an independent "fresh look" into Ms. Neal's application.

Ms. Neal argues the ALJ relied on the prior administrative medical findings of Dr. Teague

and Dr. Siddiqui and because those doctors did not conduct a fresh review, but adopted the

previous ALJ's RFC determination, the second ALJ essentially smuggled the first ALJ's RFC

determination into the second decision by relying on Dr. Teague's and Dr. Siddiqui's medical

opinions. (*See* ECF #9 at PageID 681-82). The Sixth Circuit faced this exact issue in *Dennis D. See*

2024 WL 1193662, at *6 ("In particular, Dennis D. asserts that the reviewing physicians failed to

conduct a fresh review of the current medical evidence because they started with the

understanding that they were bound by the prior RFC. And as a result, ALJ Beatty's reliance on

their determination 'tainted' his review."). There, while not deciding the issue, the *Dennis D.* Court

provided this guidance:

> Dennis D.'s argument, taken to its logical conclusion, would suggest that a
> subsequent reviewing physician's RFC assessment that mirrors a prior RFC finding
> should be ignored altogether if the wrong legal standard is announced, despite
> evidence of a fresh review. We think such a view is overbroad. As we have previously
> observed, "[f]resh review is not blind review." *Earley*, 893 F.3d at 934. Accordingly,
> "[a] later administrative law judge may consider what an earlier judge did if for no
> other reason than to strive for consistent decision making." *Id.* Without deciding the
> issue, we see no reason why the same would not hold true for subsequent medical

reviewers—we think it "fair" for them to take into account the RFC assessed for the previously-adjudicated period. *See id.* at 933.

*Id.*

Dr. Teague's opinion consisted of two portions: one ranging from the disability-onset date of November 19, 2020 to the application date of May 6, 2021; the other began after the May 6, 2021 application date. Dr. Teague adopted the prior ALJ's conclusions only in the first period, concluding:

> [Ms. Neal] has new allegation/condition of hypothyroidism. Medical evidence shows this condition is moderate in severity. However, regarding this condition, it is noted the claimant is not medication compliant. Considering this condition and the affects, it would not change the overall ALJ decision and limitations provided by that decision are still supported.

(Tr. 108, 122). For the period after the May 6, 2021 application date, Dr. Teague assessed a new RFC without the 30-minute maximum on walking and standing in the prior RFC and for support cited medical evidence from after the previous ALJ's determination. (Tr. 108-10, 122-24).

While Dr. Teague adopted the prior RFC for the first period, the record indicates he conducted a fresh review. Dr. Teague's factual findings also detail additional medical evidence from after the November 19, 2020 disability-onset date, including medical records from Ms. Neal's treating neurologist and her endocrinologist. (Tr. 101-04, 115-18). Dr. Siddiqui concluded on reconsideration that Dr. Teague's findings were consistent and supported by the medical evidence. (Tr. 135-37, 149-51). Thus, both doctors relied on medical evidence from after the prior determination, suggesting they independently reviewed Ms. Neal's application. *See Dennis D.*, 2024 WL 1193662, at *6-7 (noting use of medical records from after the period of the previous decision indicates reviewing physicians made independent determinations); *see also Carla K. v. Comm'r of Soc. Sec. Admin.*, No. 3:23-cv-290, 2024 WL 3593353, at *9 n.6 (S.D. Ohio July 31,

2024), *report and recommendation adopted*, 2024 WL 4099926 (S.D. Ohio Sept. 6, 2024). While both doctors assessed if Ms. Neal's Graves' Disease affected the previous RFC, the fact they reached the same conclusions as the previous ALJ does not necessarily imply those conclusions are unsound.

Even if I accepted Ms. Neal's argument that Drs. Teague and Siddiqui did not conduct an independent review, the Sixth Circuit has been skeptical that argument constitutes error under *Earley* and more skeptical that such an error could be extended to the ALJ where the ALJ did not fully adopt the physicians' opinions. *See Dennis D.*, 2024 WL 1193662, at *7. Here the ALJ noted that while he could not "defer or give any specific evidentiary weight" to "any prior administrative medical findings or medical opinions," the ALJ did find the opinions of Dr. Teague and Dr. Siddiqui persuasive though they understated Ms. Neal's limitations in environment, standing, and walking. (Tr. 44). The ALJ measured the opinions against the record evidence regarding her Graves' Disease (*Id.*) (citing Tr. 344, 435, 565, 574, 581, 607 and 631) and her MS. (*Id.*) (citing Tr. 435, 438, 504, 552-61, 565, 571, 608, 620, and 631-32). Based on that evidence and Ms. Neal's testimony, the ALJ added standing and walking limitations (that Drs. Teague and Siddiqui removed for the period after May 6, 2021) and added an environmental limitation to avoid heat. (Tr. 44). This suggests that even if the reviewing physicians had considered themselves bound by the previous ALJ's determinations and even if that is error, such error did not extend to the ALJ, the ultimate decider of the RFC. *See Dennis D.*, 2024 WL 1193662, at *7-8; *Gooden*, 2024 WL 2830817, at *5-6.

For these reasons, I conclude the ALJ correctly applied *Earley*'s standard by conducting a fresh review of Ms. Neal's second application. The ALJ's written decision demonstrates the ALJ focused on medical records and evidence from after the first determination and expressly

accommodated Ms. Neal's complaints in the hearing. Consequently, I decline to order remand on this basis.

## II.    The ALJ properly analyzed Ms. Neal's subjective statements of her symptoms.

In her second argument, Ms. Neal posits the ALJ did not follow Social Security Ruling (SSR) 16-3p because the ALJ "failed to consider the combined effects of her MS, Graves' Disease, major depression, and her related symptoms" and "failed to consider [Ms. Neal]'s problems with fatigue, balance, and sustainability when forming his RFC." (*See* ECF #9 at PageID 687). The Commissioner responds that the ALJ's decision shows he considered Ms. Neal's subjective statements and her argument amounts to a contention the ALJ should have weighed the evidence in her favor. (ECF #11 at PageID 704-05).

In evaluating the claimant's subjective reports of symptoms, SSR 16-3p provides that an ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the claimant's statements. These are:

1.    A claimant's daily activities;

2.    The location, duration, frequency, and intensity of pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.    Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

> 7.    Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds the complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. But the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, 2017 WL 5180304, at \*5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(2); *see also* SSR 16-3p, 2017 WL 5180304, at \*6. In reviewing an ALJ's evaluation of an individual's symptoms, the court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476.

Here, the ALJ credited Ms. Neal's statements about experiencing "numbness in her hands and feet" and her "deficits affecting her ability to lift, bend, stand, walk, and use her hands." (Tr. 40) (citing Tr. 303). Then, as SSR 16-3p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) instruct, the ALJ reviewed Ms. Neal's symptoms in light of the objective medical evidence and her daily activities, medications, and treatment and concluded that the limitations stemming from these symptoms were not as severe as Ms. Neal alleged.

First, the ALJ concluded Ms. Neal's daily activities of sitting on the couch, watching YouTube, and talking only with her mother and aunt, are not strong evidence of disability. (Tr. 43; *see also* Tr. 66-67). To the ALJ, the objective medical evidence did not suggest Ms. Neal's medical conditions were the cause of her limited daily activities as her clinical evaluations in August 2021, March 2022, and February 2023 "have constantly, albeit not universally, reported either mildly adverse or benign findings." (*See* Tr. 41-42) (citing Tr. 444-45, 607-08, 631-32). The ALJ also noted Ms. Neal described more extensive daily activities in a state agency psychological examination. (*See* Tr. 43) (citing Tr. 547). There, Ms. Neal reported "she could attend to her daily hygiene, perform household chores, shop for groceries, and prepare basic meals but was slowed by physical pain and often has low motivation." (Tr. 547).

Second, the ALJ noted Ms. Neal has been prescribed medications for her MS, though they have not been successful. (Tr. 41). Despite the failed medication trials, the ALJ noted Ms. Neal has generally reported herself as neurologically stable. (*Id.*) (citing Tr. 418, 435, 608, 621-22, 631). The ALJ noted Ms. Neal declined medication treatment for her depression and opted to continue with counseling. (Tr. 42) (citing Tr. 310, 438, 631).

The ALJ's analysis articulated multiple factors in SSR 16-3p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), including Ms. Neal's daily activities, her medications and treatment, and the objective medical evidence. The record provides substantial evidence for each factor.

Contrary to Ms. Neal's assertion that the ALJ provided no postural or balance limitations, the RFC has the postural limitation that Ms. Neal "may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds." (Tr. 39). The RFC

also includes a limitation to avoid climbing, dangerous machinery, and unprotected heights to accommodate balance issues. (Tr. 37, 44). Moreover, the ALJ accommodated Ms. Neal's statements of fatigue by incorporating limitations on walking and standing for more than 30 minutes at a time into the RFC. (Tr. 44) ("because of [Ms. Neal's testimony, transient neurological and strength deficits, I will keep in place all limitations on standing and walking from the prior decision."). Consequently, remand is not required on this basis. To the extent Ms. Neal argues the record supported her statements of disabling symptoms, such an argument would require me to review the evidence de novo, make credibility determinations, and reweigh the evidence to come to a different conclusion than the ALJ, which I cannot do. *See Brainard*, 889 F.2d at 681.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 24, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

25